## Case No. 17,323.

### WEBB et al. v. POWERS et al.

[2 Woodb. & M. 497; [1] 10 Law Rep. 152.]

Circuit Court, D. Massachusetts. May Term, 1847.

COPYRIGHT—UNRECORDED ASSIGNMENT—INFRINGEMENT—EXTENT OF COPYING ALLOWED—COMPILATIONS, ETC.—CHANCERY PROCEDURE—CONCLUSIVENESS OF MASTER'S REPORT.

1. In a suit in equity for the violation of a copyright, brought by the assignees of the copyright, the assignments, although not recorded, are still valid as between the parties, and as to all persons, like the defendants, not claiming under the assignors.

2. Where the bill alleged the plaintiffs to be citizens of the United States. and this is not denied in the answer. it must be considered as admitted, although no other evidence of citizenship is offered.

3. The report of a master in chancery may be re-examined. although the presumption is in its favor.

4. Some similarities, and some use of prior works, even to copying of small parts, are tolerated in some kinds of books; such as dictionaries of all descriptions, gazetteers, grammars, maps, arithmetics. almanacs. concordances, cyclopædias. itineraries. guide books, and similar publications.

[Cited in brief in Chicago Dollar Directory Co. v. Chicago Directory Co., 14 C. C. A. 219, 66 Fed. 983.]

5. A subsequent compiler must not use so much of the arrangement and materials of one prior, as to show a substantial invasion, and without novelty and improvement, so as to indicate no new toil and talent.

6. The leading inquiry. in such a case. is. whether the book of the defendants. taken as a whole. is substantially a copy of the plain-

[1] [Reported by Charles L. Woodbury, Esq.. and George Minot. Esq.]

tiffs; whether it has substantially the same plan and motive throughout, and is intended to supersede the other in the market, with the same class of readers and purchasers, without introducing new matter, and with only colorable deviations.

[Cited in Drury v. Ewing, Case No. 4,095.]

7. How far the purchase and sale of the defendants' books by the plaintiffs, or the delay of the latter to bring a suit, may operate as a bar,—quære?

8. Where the defendants' book (called the Flower Vase) had, like the plaintiffs' book (called Flora's Interpreter). the class, order and description of the flower placed on the same page with its name and interpretation, instead of being in notes at the end, as in a previous work, and where it copied verbatim about twenty definitions out of one hundred and forty-eight, consisting of one hundred and fifty-six words in the whole volume; and in three or four instances, some of the significations were varied in form slightly, but not in substance; and in nineteen cases, parts of the prose descriptions, &c. were the same; and it appeared that the plaintiffs had also copied other matter from previous compilers in a similar manner; and that other novelties of the plaintiffs' work were not copied by the defendants: where the defendants' work was, in substance, original, consisting chiefly of original poetry.—was much smaller than the plaintiffs', and sold at a less price; it was *held*, that the copying of such definitions did not, in itself, constitute a violation of the copyright: but that, taken together with the copying of a new feature in the arrangement of the materials, such as the transfer of the notes from the end of the book above-mentioned, both together might constitute an infringement, for which an action at law would lie. But it was *held*, that they did not furnish a sufficient ground for an injunction; especially, where the arrangement pervaded the whole work, and could not be easily separated; and where there was no intention of piracy from the plaintiffs' work.

[Cited in Greene v. Bishop, Case No. 5,763.]

9. But where the violation is clear, and the part copied can be easily separated, an injunction is usually proper against that part.

[Cited in Farmer v. Elstner, 33 Fed. 499. Cited in brief in Chicago Dollar Directory Co. v. Chicago Directory Co., 14 C. C. A. 220, 66 Fed. 984.]

This was a bill in equity, filed February 7, 1845. It alleged that, in March, 1832, Marsh & Co. published a book, called "Flora's Interpreter," prepared by Mrs. S. J. Hale, who, for a satisfactory consideration, agreed that Marsh & Co. should be the exclusive proprietors of the book, and take out a copyright for the same in their own names. The usual averments followed as to the several steps having been taken, which are required by law to make a copyright valid, and the due assignment of the same to the plaintiffs, on the 5th of July, 1842. The bill then alleged, that the plaintiffs continued to be the owners of the copyright; that the plan and combination of the matter in it, as well as divers notes, are new; and that they had numerous copies of it for sale at reasonable prices, which they wished to dispose of; but that the respondents, without the consent of the plaintiffs, on the 1st day of September, 1843, and before and after, caused to be printed and sold, and still have for sale, a large number of copies of a work, entitled "The Flower Vase, Con-

taining the Language of Flowers and Their Poetic Sentiments, by Miss S. C. Edgarton." This was averred to be an infringement on the copyright of the plaintiffs, and injurious to it and to their sales. A disclosure was asked from the defendants, how many copies of the Flower Vase had been printed by them and sold; and an injunction was prayed against further sales of the same, and an account and payment of the profits of the previous sales. The answer of the respondents was put in, April 5th, 1845, and admitted, that in September, 1843, they published and sold, and have on hand to sell, copies of the book entitled the "Flower Vase." They denied, that the plaintiffs were the sole proprietors of the book, called "Flora's Interpreter," or that the copyright thereof had been legally taken out, or that the plan and combination of its matter were new, or that they have been copied in the Flower Vase, or that the defendants have infringed on the rights of the plaintiffs, or injured them by their publication and sales of the Flower Vase. They disclose, further, that 18,100 copies of their work have been printed since July 5th, 1842, and 17,500 copies have been sold, and that it is stereotyped, and numbers struck off as needed. A replication was filed, taking issue on these denials, and, at the October term, 1845, the cause was referred to Charles Sumner, Esq., a master in chancery, to examine and report, whether the plan and combination, or materials of Flora's Interpreter, are new, so far as they have been copied in the Flower Vase, and how far any parts of it have been so copied; and to report the evidence and his conclusions thereon, to such extent as either party might desire. The master made a full and elaborate report, at the October term, 1846, in which he came to the conclusion, that all the features in the plan of the plaintiffs' book had been before combined in similar works, except the special designation of the sentiment expressed by the flower; and all the combination, except that the class, order and description of the flower are in notes at the end, and in a table or glossary there, in Flora's Dictionary, instead of being spread on the same page as in the plaintiffs' book. He also found, that the defendants had used in their book some parts of the plaintiffs', in some few instances copying not only the exact words, in the poetic signification and description, but mistakes in orthography and classification, and such as did not exist in other than the plaintiffs' book. In a few other cases, the defendants had copied the poetic signification, where it existed substantially in other books as in the plaintiffs'. In some other instances the defendants proposed to prove, that the plaintiffs had also copied freely from prior works of this kind. But this fact was admitted, as the claim of novelty in the preface was made, not to the illustration of flowers by poetry and sentiment, as that had often been done before, but to something "new in the arrangement, and the introduction of American sentiments." The master further reported, that novelty merely in

the plan or arrangement of such a book as the plaintiffs', is not a legal subject of copyright, independent of the materials. But, if it was, he reported, that the novelty in the plan, and the use of it by the defendants, was so slight, as not to amount to an infringement, by the defendants. The materials of the plaintiffs' book used by the defendants were only one hundred and fifty-six words in the same expressions, and this, whether looking to their quantity, or quality and value, was not deemed by him sufficient, in a work of this kind, to amount to an infringement of the copyright of the plaintiffs.[2] Whether the conduct of the plaintiffs had been

such as to bar their recovery, if otherwise entitled, was not decided on by the master, as he did not consider that point referred to him. Objections were also taken to his report before completing it, that he had not been sufficiently minute as to the facts, and had not stated the merely colorable deviations by the defendants from the book of the plaintiffs. But the master declined doing it, because not desired at the hearing, and not considered by him necessary for a correct decision on the merits. And he further reported, as to other exceptions, that they were applicable rather to his conclusions of law than fact, and therefore declined to

[2] The language of the master upon these points was as follows:

"And the first question that arises is the general question, whether the plan, combination, or arrangement of a book, independent of the materials and language, is susceptible of copyright. Important as this question may seem to be, it does not appear to be illustrated by the light of decided cases. The case of Hogg v. Kirby, 8 Ves. 215, has been thought to exclude the conclusion that the plan of a book was the subject of a copyright; but the injunction granted in this case seems not to have been founded on copyright, but on the power of the court to restrain a party from carrying on a trade, or from publishing a work, under a fraudulent representation that such trade or work was that of the plaintiff. See Id. note (Sumner's Ed.). The case of Cary v. Faden, 5 Ves. 23, recognizes a copyright in a road-book; but it was in the plan in combination with the materials. The case of Gray v. Russell [Case No. 5,728] says that a work may be the subject of copyright, although the materials which compose it may be found in the works of other authors antecedently printed, provided the plan, the arrangement, and the combination of those materials be original; but even this case does not decide the distinct question, whether a plan, independent of the materials to which it is applied, and on which it is wrought, is a subject of copyright. In the absence of any governing authority, the question must be regarded in the light of principle. It cannot be disguised that the plan of a book is often a peculiar part of its merits. Some authors receive high commendation merely for the arrangement of their subject, descending even to such particulars as the division into chapters and sections; and again even into the further divisions of paragraphs. This is applicable to historical compositions as well as to scientific and philosophic productions. It would be difficult, however, if not impossible, to hold a subsequent writer amenable to any other tribunal than that of criticism, who should write another work on the same subject in language of his own, but cast in the same chapters and sections. Indeed, the law in such a case as I am now supposing, seems to be clearly settled in the matter of abridgments. An honest abridgment is admitted to be no violation of the copyright of the work abridged; but the very idea of an abridgment implies the preservation of the original plan, arrangement and combination, abridged, or reduced to a smaller scale. Indeed, it will cease to be an abridgment exclusively, if it does not preserve these features: as a miniature would fail to be a portrait if the original proportions and traits of the countenance are not represented. In making an abridgment of Mr. Irving's Life of Columbus, or Mr. Bancroft's History of the United States, the natural and inevitable course would be to follow their plan, to walk by their light, to keep firm hold of the thread which they have provided in their narratives: to adopt their mode of developing the subject: to rely upon their divisions; to lean upon all the landmarks which

29FED.CAS.—33

they have set up; in short, to abridge their works, by preserving, as far as possible, the original peculiarities in a smaller compass. Perhaps no class of works are subjected to abridgments more than dictionaries, nor has any person questioned the lawfulness of such abridgments; but they cannot fail to preserve the plan, arrangement, and combination of the original dictionary. Take, for instance, the recent extensive and most important dictionary of the English language, by Richardson, which is on a plan entirely new, I believe, as applied to the English language. Can it be doubted that an abridgment of this work might be made, reducing its two quartos to a single octavo, in which its peculiar plan should be preserved? Nor does it seem to me that it can be doubted that another dictionary, of another language, or even of the English language, may be made on Richardson's plan, which shall not be an abridgment, but shall be founded on fresh labor and fresh materials.

"Let us regard for a moment the peculiar plan of the plaintiffs' book. It is here applied to the illustration of botany. Suppose this identical plan applied to different works illustrating the kindred sciences of geology, zoology, or ornithology, would the plaintiffs have a right to proceed against these works? If, however, there is a copyright in a mere plan, they clearly would have this right. All the details of their plan are applicable to birds as well as to flowers; they both have (1) a common or popular name, (2) a scientific name, (3) a class and order, and both susceptible of short descriptions, (4) a poetic signification may be devised for each, (5) poetic authorities may be found or invented in support of the signification. It seems very clear that an ornithological interpreter, following precisely the plan, arrangement and combination of the plaintiffs' book ('Flora's Interpreter'), would not be an infringement of their copyright. But it must be admitted that the circumstance that the plans of two works are identical, may be important evidence to show that one book is a copy of the other. It may happen that the plan of a work is so imbedded in the very materials of which it is composed, so inwoven into its very texture, that the two cannot be separated, or at least that the appropriation of the plan, without the excuse of an abridgment, may lead to the natural inference that there was an unfair use of the earlier work. It does not, however, seem to me that there is any thing in the character of the plaintiffs' plan, which can entitle it qua plan to the protection of the law. I cannot hesitate, therefore, to find that, in point of law, the mere plan, arrangement, or combination of a book like the plaintiffs', independent of the material to which it is applied, is not the subject of copyright. Supposing, however, that the plan, arrangement, or combination of a book, independent of the materials, were susceptible of copyright, the question would then arise whether the part of the plan, arrangement, or combination, copied or taken by the defendants, amounted to an infringement. By reference to the facts as I have found them, it will appear that each of

make any change. Some of the evidence in the case was annexed to the report, and is referred to in the opinion of the court, when deemed material, as will be other portions of the master's report, and the book of the plaintiffs, as well as that of the defendants, copies of both of which are filed in the case.

Sidney Bartlett, for complainants.

The character of the work for which the plaintiffs claim protection, as found by the master, is twofold: 1st, and principally as a compilation involving a plan, combination and arrangement; 2d, as being, to a partial and limited extent, original. The case will be placed by the plaintiffs on three propositions: I. That, treating the plaintiffs' book as a mere compilation (and wholly irrespective of their rights in the plan, combination and arrangement, and also of the piracy, by the defendants, of the new and original matter), the proof shows a violation of their rights by the defendants which, upon established principles, will be restrained by injunction. II. That if treating the plaintiffs' book as a mere compilation, the proof did not show such violation as above alleged, yet that the plan, combination and arrangement of the plaintiffs' work (irrespective of the materials with which they are connected), is their prop-

erty, protected by law as against a rival work, and that it has been violated by defendants. III. That if the plan, combination and arrangement, separate from the materials, were not by law protected as against a rival work, yet that the proof in this case shows, in addition to copying the plaintiffs' plan and arrangement, the defendants have also copied servilely (blunders and all) plaintiffs' selected materials connected with their plan and arrangement, and their new and original matter connected with said plan and arrangement, and thus, upon undisputed principles, ought to be enjoined.

As to the first point, that treated as a mere compilation, the plaintiffs' book and rights have been violated, the report of the master proceeds on a mistake of the law. The doctrine is well established, that compilations are protected to the extent that no rival work can servilely copy from such compilation, or take advantage of a selection, but may resort to the original works as authorities. Longman v. Winchester, 16 Ves. 270; Wilkins v. Aikin, 17 Ves. 424; Matthewson v. Stockdale, 12 Ves. 270; Gray v. Russell [Case No. 5,728].

There remain then, on this point, the mere questions of fact: Are the works rival works; have the defendants servilely copied, to what proved extent, and what is the legal inference

---

the features, constituting the combination of the plaintiffs' book, had been employed in prior and kindred works, and that all of them but two had been actually combined on the same page in Flora's Dictionary; but these very features had been introduced into the French 'Flore Medicale.' The question, then, arises whether the employment, by the defendants, of the description, and class, and order in their plan is an infringement. It seems to me very clearly that it is not. The description, class, and order had been introduced on the page in a similar way in the 'Flore Medicale,' and they had been actually employed in Flora's Dictionary, though they were introduced at the end. The portion of the plan or combination of the plaintiffs that has been copied is so small as to be immaterial, almost inappreciable. It falls naturally under the maxim of the law, 'De minimis non curat lex.' I therefore find that there has been no infringement of the copyright of the plaintiffs, so far as regards the plan, arrangement, or combination.

"The next question is, whether, in point of law, the materials taken or copied by the defendants, amount to an infringement of the copyright of the plaintiffs. I have already set forth what has been actually taken,—amounting in all to one hundred and fifty-six words. Is the taking of these words an infringement? It is unquestionable in law that an author may make use of the labors of his predecessors. Indeed, almost all books, except a few of rare genius, are more or less derived from the various labors of earlier authors. To such an extent is this true, that the famous saying of old Burton approves itself to all minds, that books are like medicines, which the apothecary composes by pouring from one phial into another. The law of copyright does not absolutely cut off the use of a book under its protection, so that nothing from it can be poured into new volumes. It merely restrains the use to such an extent that there shall be no material interference with the contents of the book, and that it shall appear to be used in good faith and not colorably, in order to make a profit out of the labors of the earlier author. Under this principle, the author of an

abridgment is protected, although he employs sentences, passages, and pages from the preceding book. But it would be difficult to imagine any abridgment of any work which should not contain more of ipsissima verba of the original work than the defendants' book contains of the plaintiffs'. Looking at the actual quantity that has been taken, it seems trifling. It is far less than a reviewer would extract who should review the book; nor would it probably be deemed worthy of notice, if five times the amount were extracted from the plaintiffs' book, and published in all the newspapers of the country. I would put this question distinctly, whether there can be any doubt that editors of journals and reviews of all kinds would be considered justifiable in extracting a far larger amount? If they would be considered justifiable, the question then distinctly arises, whether the defendants could not make a similar use, in short, whether the fact that they were engaged in a work in pari materia should exclude them from rights enjoyed by all the rest of the world. It seems to me clearly not. It is said, in some of the cases, that it is not only quantity that is looked to, but value, in determining the question of infringement. Bramwell v. Halcomb, 3 Mylne & C. 738. Whether I regard quantity or value, I am compelled to conclude that the part of the materials copied by the defendants, is too insignificant in character for the law to notice. I therefore find that there is in no respect an infringement, by the defendants, of the copyright of the plaintiffs. This finding seems to determine all the points that have been referred to me by the order of the court. Another point was raised by the counsel, and evidence touching it introduced, viz.: that the plaintiffs, by their conduct, had concluded themselves to such a degree that they could not appeal to the equitable jurisdiction of the court. Although the evidence introduced in connection with the law on this subject, as illustrated in two recent cases in English chancery (Saunders v. Smith, 3 Mylne & C. 711, and Rundell v. Murray, Jac. 311), seems to conclude this point. I forbear from expressing my conclusions thereupon, because it does not seem to have been referred to me."

from the extent proved, as to the residue being or not being a servile copy? 1. That the two books are upon the same subject, on the same plan and intended as rival works, is admitted and assumed throughout the master's report. 2. That the defendants, in making their book, had the plaintiffs' book before them, is admitted by their preface; and that they used the plaintiffs' book, was a fact distinctly admitted by them at the hearing, as appears by the master's report. 3. Was it used as a guide to the original authorities, or did they servilely copy? This is answered by the proofs made by the plaintiffs, of numerous cases where the plaintiffs' blunders are servilely copied and perpetuated. 4. The legal inference of this proof is, at least, that all those parts of the plaintiffs' book, ejusdem generis, have been servilely copied. Matthewson v. Stockdale, 12 Ves. 270; Mawman v. Tegg, 2 Russ. 385, 394. 5. This legal inference is conclusively supported by the fact, that, since the hearing upon motion for temporary injunction, the defendants (though that course was suggested by the judge, and is shown by the cases to be uniformly pursued) have failed to take the testimony of their compiler, Miss Edgarton, to show to what extent the plaintiffs' book was copied, and this leads to a cogent inference that other parts of the plaintiffs' book were also copied. 6. As affecting the good faith of the defendants, it is to be noted, that their preface says (as to these very parts of the plaintiffs' book thus shown to be copied, blunders and all) "though the compiler has imitated, she has not copied." Also, that the answer flatly denies copying. 7. The most favorable result to the defendants in the proof is, that, viewing the plaintiffs' work as a mere compilation, and confining the inquiry to the violation of it by the defendants in that respect merely, the whole nomenclature of flowers and their botanical divisions into classes and orders, is servilely copied by the defendants.

The next point is, that the plaintiffs' plan and arrangement are, as against a rival work, protected, and have been violated. 1. The extent to which plaintiffs' plan, combination and arrangement are original, and of its identity with defendants' book, are summed up by the master. 2. The defect of the master's report is, that it disposes of each subject of violation separately, and nowhere considers their united effect. 3. The plaintiffs' whole merit on this point is, that they have combined in a head note on the same page two features, which were never before combined on the same page of any work, either ejusdem generis or scientific, and the test of the value of this combination is, that the defendants have exactly copied this arrangement of the two features. 4. The plaintiffs further suppose, too, that a new combination is protected as a whole, and not merely the parts which were never before combined. Emerson v. Davies [Case No. 4,436]. 5. The fact of violation, its extent and value being determined, there remains the question of law, whether plan, combination and arrangement, separate from the materials with which they are connected, are the subject of copyright, and on this point the following cases would be conclusive. Emerson v. Davies and Gray v. Russell [supra].

The next point is, that the defendants have not only used the plaintiffs' plan and combination, and used it in connection with the plaintiffs' compiled materials, but also pirated, in connection with both the above, the plaintiffs' original matter. The extent of this violation by copying in verbis, is shown in the master's report. This enumeration excludes copying with colorable alterations of phraseology, because, as the master says, among other things, that it would be unimportant and immaterial in determining the merits of the case.

And as to the third objection, that it was inconsistent with his views of the law. The authorities on this point of colorable alterations, are 12 Ves. 270. The plaintiffs suppose this to have been a clear mistake of law, and his duty by the master: but as the aggregated violations are sufficient, as they suppose, to furnish them a remedy, they only use the point to show that there exist in the defendants' book colorable alterations of the plaintiffs' original matter, to some undefined extent. One portion of the original matter thus copied in verbis is "the poetic signification of flowers." These are the work of study and taste, and give a principal value to the work. Of these twenty have been literally copied, besides those copied with colorable variations. But it has now been indisputably shown that the defendants have servilely copied: 1. The whole of the plaintiffs' compilation of the nomenclature of flowers, and their botanical division into classes and orders without resort to the original authorities. 2. To a certain extent in verbis, and to a presumed extent with colorable alterations, the plaintiffs' poetic signification of flowers; and also the plaintiffs' description of flowers and their localities. 3. As these last occur in the plaintiffs' book in the same head note, which contains the nomenclature and botanical description that were shown to have been copied, blunders and all, the legal inference is, that the whole of the defendants' head notes were copied from the plaintiffs'. 4. In addition to this, the defendants are shown to have copied the plan, combination and arrangement with which in the plaintiffs' book the above materials thus borrowed are connected.

There remains a farther question as to the remedy. The principles that regulate the granting injunctions in these cases are: 1. The quantity and value of the part taken. 2. If quantity be small, then the question is, whether there existed the animus furandi. Gods. Pat. 216. Looking at and aggregating the various parts of the plaintiffs' work, proven and presumed in law to have been copied

in verbis, and the undefined amount copied with colorable variations, the plaintiffs respectfully submit, that in case of a rival work, designed, as will be obvious, to drive, by its cheapness, the plaintiffs' work from the market the quantity and value of the parts taken are sufficient to warrant the injunction. But if a doubt existed as to quantity, the animus furandi is clear, and comes in aid of the plaintiffs. The manner of taking without acknowledgment (see 17 Ves. 422; 3 Mylne & C. 737), the denial in the answer of the defendants, and the preface of their book, the failure to produce the testimony of their compiler, determine the animus. The next question as to remedy, is its extent. That is, can the court in its injunction separate the borrowed parts, which, when capable of ascertainment, it usually does? or, is this a case in which, as the defendants had ample means, by introducing the evidence of their compiler to distinguish what she copied, and have failed to do it, the language of Lord Eldon, in Mawman v. Tegg, 2 Russ. 385–390, and Emerson v. Davies [supra], is to be applied. The case has now come up for final decree. The defendants had full opportunity before the master, and again under the admonition of the court at the hearing for a temporary injunction; they are not entitled now to delay, and add to the plaintiffs' expenses by further proceedings. There will be an attempt made by defendants to avoid the legal consequences of their conduct, by insisting at the hearing upon the laches of the plaintiff in bringing this bill. It is a sufficient answer to the point, that no such defence is set up in the answer, and cannot therefore now be heard. The reason is, that the plaintiffs must have notice to the end that they may amend their bill, and show the circumstances. 2 Daniell, Ch. Prac. (Perkins' Ed.) 814, (old Ed.) 240; Doggett v. Emerson [Case No. 3,960]; Langdon v. Goddard [Id. 8,060]; The Chusan [Id. 2,717]. But if the question were open to the defendants, there is nothing which, according to established principles, would affect the plaintiffs; for: 1. If they had been the authors of their book, and therefore familiar with its contents, and capable of readily detecting piracies, instead of booksellers, yet nothing is clearer than even when lapse of time has exceeded the period of limitation, yet, if the defendants have not been deceived, or led to change their condition, they cannot set up merely laches. 2. The defendants' work was stereotyped in 1842, and no proof of change of condition is offered or set up by the answer. The cases of laches are, Platt v. Button, 19 Ves. 447; Rundell v. Murray, Jac. 311 (331); Saunders v. Smith, 3 Mylne & C. 737.

P. W. Chandler, for respondents.

WOODBURY, Circuit Justice. Several objections are urged in this case against a recovery by the plaintiffs, which are formal rather than substantial. One is, that the assignments, under which they claim, do not appear to have been recorded. But they are still valid as between the parties, and as to all persons like the defendants, not claiming under the assignors. See cases in Leland v. The Medora [Case No. 8,-237], Mass. Dist., Oct. 1846. Another is, that the plaintiffs are not proved to be citizens of the United States. But that being averred in the bill, and not denied by the answer, must be considered as admitted. There are some other objections, which have either been removed by evidence, or probably may be; and hence, if the case can be decided on the merits, without delay and expense as to any formal objection, it will be better for both parties that this should be done. Passing by, then, the other preliminary exceptions, how does this case stand on the merits? The report of the master is in favor of the defendants. From the care evinced in the examination, and the high character of the gentleman who made it, much weight must be given to its conclusions. But the parties are entitled to a revision of it here, and, though the presumptions are in its favor, at the outset of the examination, yet if it cannot stand the scrutiny, to which it has been subjected in argument, and which the court is bound to bestow on it, the plaintiffs ought to succeed.

It may conduce to a more lucid exposition of the merits between these parties, as to the originality of their respective books, to ascertain, first, what each claims as novel or peculiar. Neither of the parties makes any pretence to be inventors of dictionaries of flowers. Whether arranging them alphabetically or scientifically, and whether describing and defining them in prose or poetry, according to their classes and orders, or their medical virtues, or the sentiments they are accustomed to inspire, and whether illustrated by engravings of them, or the opinions of those most experienced in the beautiful hues and figurative language of flowers,—all this had been done before the first of these publications. It had been done, too, not only abroad, but in this country, and more especially in the "Flora's Dictionary," published in Baltimore, in 1830, and republished in 1831, with the reputation of having been compiled by Mrs. Wirt. In the preface to the plaintiffs' book, Mrs. Hale acknowledges her obligations to other writers on this subject, and more especially to the author of Flora's Dictionary, just described. And in the preface to the book of the defendants, Miss Edgarton also expresses her indebtedness to others, who had labored in this garden before her, and especially to the "Flora's Interpreter" of the plaintiffs. Again, there is much discrimination to be used in inquiries of this character, between different kinds of books, some of which, from their nature, cannot be expected to be entirely new. Thus, dictionaries of all descriptions, when on like subjects, philological, lexicographical, professional, or scientific, must contain many definitions and descriptions, almost identical; as must gazetteers, grammars, maps, arithmetics, almanacs, concordances, cyclopæ-

dias, itineraries, guide books, and similar publications. In these, if great errors have not previously existed, or unusual ignorance to be corrected, no great novelty is practicable or useful; unless it be to add new discoveries or inventions. new names, or words, or decisions,—so as to post up the subject to more recent periods,—or unless it be to abridge and omit details, and condense a more voluminous work into a smaller and cheaper form, so as to bring its purchase and use within the reach of new and less wealthy classes in society. Some similarities, and some use of prior works, even to copying of small parts, are in such cases tolerated, if the main design and execution are in reality novel or improved, and not a mere cover for important piracies from others. Trusler v. Murray, 1 East, 363, note; Gray v. Russell [Case No. 5,728]; 12 Ves. 270; 16 Ves. 269; 17 Ves. 422. What was there novel, then, in the combination and materials of the plaintiffs' book which the defendants have copied? Nothing in the arrangement, except that the "class and order and description of the flower" are placed on the same page, with its name and interpretation. instead of being in notes at the end, as in the second edition of Flora's Dictionary. In the materials there is, also, a novelty in the special designation of the sentiment in the plaintiffs' book, which is not in Flora's Dictionary. But the defendants have not imitated that, and hence it becomes unimportant. All, then, which the defendants have copied in the arrangement, which did not exist in other books than the plaintiffs', and to which the plaintiffs of course have no exclusive claim, is the mere transfer of the notes to the same page with the flower to which they relate,—a closer juxtaposition; and all in the materials of the plaintiffs, which are original, and have been copied verbatim, are a few "poetic significations." or definitions, being about twenty in one hundred and forty-eight, and consisting of only one hundred and fifty-six words out of the whole volume. In three or four other instances, some of the significations are varied in form slightly, but not in substance; and in nineteen cases, parts of the descriptions of flowers, and their localities. in prose. are used by the defendants, which were employed by the plaintiffs. The defendants offered to prove, in explanation of this, that the plaintiffs had copied in this way still more extensively from others; and it is difficult to conceive of different works, describing the appearance and locality of the same plants, not using like language. and often in some particulars the same, if the plant or flower has been long known, and the notices of them are, as in these cases, very brief, being embodied frequently in a single line. In compiling dictionaries of all kinds, gazetteers. and similar works. the materials of all must, to a considerable extent. be the same, and to such an extent are allowable; and the novelty or improvement, as before remarked, can be substantial in scarcely any case. unless the matter is usefully abridged in bulk and price, or a material change is made in arrangement. or more mod-

ern information is added in valuable quantities, or important errors are corrected, or important omissions are supplied. While, on the one hand, a prior compiler is not permitted to monopolize what was not original in himself, and what must be nearly identical in all such works on a like subject; yet he, who uses it subsequently to another, must not employ so much of the prior arrangement and materials as to show that the last work is a substantial invasion on the other, and is not characterized by enough new or improved, to indicate new toil and talent, and new property and rights in the last compiler. That is the cardinal distinction. Thus a material addition is made to a common dictionary, which shall, like Webster's, add definitions of a large number of words before omitted; or quotations from the authors, who have employed the words in the sense adopted. like Johnson's; or rules for the proper pronunciation of each word, like Walker's; or the roots from which the word has been derived, like several others. And no one would complain of a new dictionary as an infringement on former ones, if it contained any of these important additions, and had not in other respects servilely copied but a few definitions of old words from any one former author. Now was the defendants' book of this character, or otherwise? A little further scrutiny into this case will show, whether the change here by the defendants was real or only colorable. They followed, to be sure, the arrangement of the plaintiffs, but that arrangement was not novel with them, except putting on the same page, one part of the account of the flowers, which before had been placed in notes at the end. This could hardly be deemed of sufficient importance to justify a prosecution, unless connected with other infringements as to materials and design, or unless this was a change more essential in some other respects than a mere transfer of similar matter from one page to another. But of this more hereafter. Besides this, however. it is contended. that the defendants have copied materials and design also to such an extent. as to be convicted of a substantial infringement.

The leading inquiry then arises, which is decisive of the general equities between these parties, whether the book of the defendants, taken as a whole. is substantially a copy of the plaintiffs? whether it has virtually the same plan and character throughout, and is intended to supersede the other in the market with the same class of readers and purchasers, by introducing no considerable new matter, or little or nothing new. except colorable deviations?

We have already stated the quantity of materials literally copied, amounting to only about one hundred and fifty-six words. Perhaps half as many more may be considered substantial uses of the plaintiffs' book. But what are the differences? numerous or not? essential or trivial? To illustrate the differences in these two works, in order to see whether they are substantial or otherwise, it will be necessary to compare first their prefaces. They of course profess to relate to like subjects, as do all mod-

ern Floras of this character, and must therefore, as before remarked, contain something of the same matter. But do they really and materially in any respects differ? Their claims and pretensions, in the prefaces, are certainly not the same. The book of the plaintiffs claims merely some novelty in its arrangement, and the use of American poetry to illustrate what is there called the sentiment of flowers. The novelty in arrangement, as before shown, does exist, but is very trifling so far as regards anything imitated by the defendants. But there was another novelty, perhaps more material, which was not imitated by them, in giving first some European or anonymous poetry on the signification of each flower, and then separately some remarks by American authors, illustrative of the sentiment inspired by each flower. This last, and this substitution of American sentiments and authors for foreign ones, seem to me to constitute the great novelty and attraction of the plaintiffs' book, in its matter, over others on this subject, which had preceded it. In this way quotations are introduced from sixty to seventy different American poets, and twenty to forty pieces from some of them, besides the many beautiful extracts given from foreign poets under the other head of illustrating the "signification of flowers." In this way the authoress of the plaintiffs' book was original, in these important particulars, but not in giving a poetical language to flowers, or discussing a sentiment in them, a symbol of affection, as these had existed here before and in Europe, and in the East for ages, if not since Paradise. This authoress also attempted to unite some botanical instruction with poetry; but that was not a new union or combination, nor did she, however highly gifted and favorably known, in other respects, pretend to furnish any scientific information beyond what is contained in Linnæus, Jussieu, Eaton, and other botanists, nor even to emulate Darwin's "Loves of the Plants." On the other hand, what novelty did the authoress of the defendants' book aim at? the same? or none? She claimed none in the arrangement, and that of other writers on flowers, and that especially in the plaintiffs' book, where original, was in some degree followed, as before shown, in transposing notes from the end to the page to which they apply. But even in arrangement the last was not like the plaintiffs' in a few important particulars. There is not one piece of poetry cited to show the signification, and another piece to show the sentiment, as in the plaintiffs', but generally only a single piece for each flower, and that to illustrate merely what she calls the sentiment. But in materials, the defendants' book furnishes, and professes to furnish, a striking difference. The poetry, instead of being quoted from American authors of celebrity, like the plaintiffs', claims to be chiefly original by Miss Edgarton herself, and her title to it is not denied in the answer or the argument. The substance, the staple of the book, is then truly original, and not colorably so; as much as if she had undertaken to publish a volume of poetry, chiefly original, on

the subject of Flowers. Again, Mrs. Hale's book, belonging to the plaintiffs, is one in several respects of higher and more ambitious pretensions than the defendants'; pretensions, too, well sustained. It is an octavo volume. It consists of some two hundred and twenty-four pages. It has two colored engravings; has a double index, one to the flowers, and one to their interpretations, and double pieces of poetry to each flower, usually extracted for one purpose from distinguished foreign poets, and for the other from distinguished Americans; and has five pages of instruction and explanations in botanical science, as an introduction; and has been sold per copy at one dollar, or one dollar and twenty-five cents. While, on the other hand, the defendants, in the preface, claim only the merit of a book on the subject much less expensive, and chiefly original in all its poetry, instead of extracts from eminent writers; and it is only a small duodecimo, instead of an octavo, with but one hundred and fifty-one pages, of that reduced size, instead of two hundred and twenty-four, and of larger size; and it has no scientific introduction on botany, has no plates or engravings, and only one index to the flowers; has no double illustrations of the signification and sentiments, and sells for merely twenty-five cents a copy, or less than one fourth of the price of the other.

On a computation it will be found, that the plaintiffs' book is on so different a scale as to contain near three times more matter than the defendants', besides being so different in the substance and originality of it; and that it illustrates many more flowers, being two hundred and thirty, while the defendants' illustrates only one hundred and forty-eight. The stock used in each per volume, differs in a still greater ratio; and in the defendants', from its smaller type as well as less matter, is probably not one fourth of that in the plaintiffs'. For a further illustration, using their own favorite language and symbols, both of these works are flowers, and not destitute of charms; but one is more like the magnolia grandiflora or japonica in size and attraction, and the other, like the wayside violet or anemone. They both come from females, with loveliness peculiar to their sex; but they still essentially differ; as one develops matronly experience and more ripened graces, while the other is just opening her buds and blossoms. It will thus be seen, that the book of the defendants is much less complete and useful than that of the plaintiffs; is suited for a different and humbler class of readers; and would, in truth, be little more than an abridgment, if its poetry was not chiefly original, and some of its other features so different. See the case of Johnson's Rasselas, in Dodsley v. Kinnersley. Amb. 403; Bell v. Walker, 1 Brown, Ch. 451; Gods. Pat. 339. Considering then its form and substance, its design and use, my mind strongly inclines to the conclusion, that the aim of Miss Edgarton in preparing the defendants' book

was in truth what she describes it to be in her preface, to furnish original poetry on the sentiment of flowers, and to do it in such a form as to be much less expensive, and to circulate in hands, which could not so well afford to purchase the existing and larger and more expensive treatises on that subject. In effecting this object, she did not aspire to novelty in arrangement, or discoveries in science as to botany, but in some respects copied from others, and among them from Mrs. Hale, as she had a right to do in some degree, and to some extent, if it was not her main design to compile a like treatise, with only colorable but not real differences. The copying of errors or mistakes in such cases is therefore not unusual, and only shows the fact more clearly of the actual copying in those particulars, but cannot affect the question, whether they are enough in quantity and value to characterize the whole work or its main design to be a piracy. 12 Ves. 270; 17 Ves. 422; 1 East, 363; Mawman v. Tegg, 2 Russ. 385. That depends on other considerations.

Believing then the main design in the defendants' book to have been different in important respects from that of the plaintiffs', in regard to the production and publication of original rather than extracted poetry to illustrate the sentiment of flowers, and in several things varying in material details from the plaintiffs', with a view to make it less expensive and to circulate among a different class of readers, rather than be a substitute with the same class, I see in this no infringement on the copyright of the plaintiffs, and do not consider this design and the execution of it to be void, because in carrying it out a use is made in its botanical descriptions of former works to some extent, and their arrangements in part copied. Wilkins v. Aikin, 17 Ves. 422; Gods. Pat. 215; Cary v. Kearsley, 4 Esp. 168. More especially the plaintiffs cannot complain of this, when they have done the same as extensively in respect to others. The nature and value of the parts copied, being chiefly definitions and descriptive epithets, indicate no appropriation of much mental toil in others, any more than does the small quantity. White flowers must in all such books be described as "white," and red as of a "red hue," and those from India as belonging to the East; and it is so in like cases, and of like character, in several of the similarities here. 3 Mylne & C. 740; 4 Esp. 168. They could not be described in any other way, if described naturally and truly. But when these copyings or close resemblances have gone further, and beside the few lines of description and the few parts of others have encroached on one feature in the arrangement, new or peculiar in the plaintiffs' book, they do, thus combined, probably constitute a legal infringement of their copyright; but they hardly seem to furnish a sufficient ground for the extraordinary interposition of this court by a permanent injunction. I say, both combined; for in a work of this character, partaking so much of the nature of a dictionary, these copies of definitions, so few and unimportant in number and value compared with the whole work, are not, independent of following the plaintiffs' plan, to be regarded as a violation of the plaintiffs' copyright, when the main design is of a new and different character. They are nothing compared with what is ordinary, and almost inevitable in all new works on such a subject. Nothing compared with what is usual in reviews of a work, and is there allowable as being neither a rival nor substitute. Bramwell v. Halcomb, 3 Mylne & C. 738. Nothing improper in an abridgment. If the leading design is truly to abridge and cheapen the price, and that by mental labor is faithfully done, it is no ground for prosecution by the owner of a copyright of the principal work. Gods. Pat. 238; Gray v. Russell [Case No. 5,728]. But it is otherwise, if the abridgment or similar work be colorable and a mere substitute. Butterworth v. Robinson, 5 Ves. 709. One test of this is the quantity and value of the matter extracted. In 1 Camp. 97, a case is stated of seventy-five pages copied out of one hundred and eighteen. In 2 Russ. 388, the close imitation of copying was twenty pages out of forty-eight, or nearly one half, and hence vitiated the work. 11 Sim. 31. And in 1 East, 363, twenty pages were copied literatim et verbatim. Here it is but parts of twenty or thirty lines out of near seven thousand. The former, so great a quantity, indicates theft, animus furandi. The latter, so small a quantity, indicates rather illustration, and comports with the preface acknowledging aid from the plaintiffs' work, but having some different and material purposes to accomplish, and not being a mere substitute, with no essential changes. Gods. Pat. 216; Eden, Inj. 381, note; Roworth v. Wilkes, 1 Camp. 97; 2 Kent, Comm. 382; 8 Ves. 225. Where nine tenths was copied, an injunction was clearly proper (1 East, 358), but not where only one tenth was copied (Amb. 403). See, also, Folsom v. Marsh [Case No. 4,901]. Or as here, not one two-hundredth.

But the aspect of this case becomes somewhat different and more favorable to the complainants, when we add to this the other circumstance, that a small part of the novelty in the arrangement has been imitated. Though small in value, such an imitation or appropriation of another's invention may be actionable; and the subject of an injunction, perhaps, if easily separated from the rest of the book. Emerson v. Davies [supra]; Lewis v. Fullarton, 2 Beav. 6; Barfield v. Nicholson, 2 Sim. & S. 1, 6; 16 Ves. 270; Wilkins v. Aikin, 17 Ves. 424; Stockdale's Case, 12 Ves. 270; Gray v. Russell [supra]. But it is doubtful, whether this small transfer of matter to a new place is sufficient alone to sustain a copyright, without some new and additional materials; and more doubtful still whether an injunction ought to is-

sue, when the whole is pervaded or leavened by it, and the whole destroyed on account of it, rather than damages given only to the extent or value of the encroachment. But here the adoption of the new feature in the arrangement, however small it be, pervades the whole work, and no permanent injunction can issue against it without destroying the whole work as now compiled. I think, therefore, that such a remedy, applied to a case situated like this, would be disproportionate, unsuited to the case, and hence unjust. Whatever damages the plaintiffs have thus sustained may, however, be obtained by a suit at law, without destroying the whole work; and that is therefore the more equitable relief in a state of facts like these. Drew. Inj. 199; Bell v. Whitehead, 17 Law J. 441 [S Law J. Ch. (N. S.) 141]; 9 Law J. Ch. (N. S.) 323; 1 East, 385. On the contrary, where the violation is clear, and the part copied can readily be separated, then an injunction is usually proper against that part. London Lat. Comp. v. Bedells. Webst. Pat. 140; 13 Rep. of Arts, 167; Emerson v. Davies [supra]. So, where a party wilfully mixes or interweaves the property of another, with his own, with a bad motive, and so as not to be easily separated, he may be required at times to lose the whole. 2 Russ. 385; 2 Brown, Ch. 85. But here the motive does not seem to have been culpable, the plan cannot be separated from the work, and the plaintiffs can obtain ample redress at law in damages, without destroying the whole.

Both parties have relied upon the opinion of the district judge in this case, being in their favor, when refusing a temporary injunction, but ordering an account of sales to be kept and the plates not sold. He thought more light would be flung on the case at the final hearing, by the testimony of Miss Edgarton being particular as to the extent she used and meant to use the plaintiffs' book. But neither party have asked leave to offer it, and the inclination of his mind seems to have been, that the part of the arrangement claimed to be original by the plaintiffs, and followed by the defendants, was hardly sufficient to justify an injunction. A novelty in arrangement, especially so trifling as this, without any new material connected with it, seemed to him, and still seems to him to be, of questionable sufficiency to be protected by a copyright. The master seemed to be of the same opinion, on the ground "De minimis non curat lex." Slight changes, like the use of chapters and verses, where none existed before, as some hundreds of years ago in the Bible, or the introduction of punctuation, which is said not now to exist generally in acts of parliament, or the use of sections instead of pages, which in modern times is reviving only an ancient practice, would all have higher claims to novelty and usefulness, than merely transferring the same material from one page at the end to another in the central part of a book, as here. Some machines have been changed merely by inverting their position; but they are not deemed entitled to protection. But, however

this may be sufficient or not, to claim legal protection (and I am inclined to think it is), my opinion, as before intimated, is, that the use of it should not be enjoined against, when it runs through the whole book, and cannot be separated from the rest. It would generally be equitable and just to let the party, under such circumstances, seek redress for it by damages in a suit at law. It is not a suitable case for the exercise of a peremptory injunction, which is chiefly to aid legal rights, and in cases of copyrights runs against specific parts copied. It is usually done to work substantial justice between the parties, rather than destroy the whole book of the defendants, for the small infringement in the arrangement, if otherwise it was novel, and unexceptionable, and useful to the community. See cases where a part may be enjoined against, 17 Ves. 422; 11 Sim. 31; 2 Russ. 385; 3 Mylne & C. 737.

This conclusion renders it unnecessary to decide on the point how far the conduct of the plaintiffs, in the purchase and sale of the work of the defendants, and in some delay to prosecute, should bar this application, though redress might perhaps be still had at law. On this see Eden, Inj. 207; 7 Ves. 1; 19 Ves. 447; 3 Mylne & C. 711; Rundell v. Murray, Jac. 311; Lewis v. Chapman, 3 Beav. 133; 8 Ves. 224, note. And for the same reason, the motion by the defendants to file a supplemental answer, in order to allege that matter more specifically, need not be acted on. On the necessity for this, see 2 Daniell, Ch. Prac. 814; Taylor v. Carpenter [Case No. 13,784]; Doggett v. Emerson [Id. 3,-960]. Delay in this bill is also urged against it; but length of time so as to bar, by any statute of limitation, must be pleaded. 19 Ves. 447; 2 Jac. 311; cases cited in Hunter v. Marlboro' [Case No. 6,908]; Taylor v. Benham, 5 How. [46 U. S.] 233. And if to bar, independent of the statute, a change of circumstances and injury by the delay must appear.

Another point made was, the master's refusal to go into an inquiry as to the extent of colorable imitations. Though in the master's situation I should have been disposed to make the inquiry, there was some ground for his refusal, after the hearing was over, it not having been pressed before. It is pretty decisive, however, that such instances were not frequent, or they would earlier have been suggested, or could more readily be pointed out. And there is no pretence that they can exist in the great mass of the defendants' book, as it professes to be original matter, and no exception has been made that it is not truly original.

The intent not to be guilty of piracy, which has likewise been referred to in the argument, would not be material, if much had actually been copied, and the new work was a mere substitute. But if this be doubtful, the intent not to pilfer from another, colorably or otherwise, for the substantial portions of the new work, may be important. In fine, as, from all the evidence in this case, it seems quite clear, that the main intent was to make a much cheaper work, and one with original poetry,

rather than colorably to republish the plaintiffs' or any similar book, I think the prayer for an injunction must be refused.